This timely appeal comes for consideration upon the record in the trial court and the parties' briefs. Defendant-Appellant, Donald Grimm (hereinafter "Donald"), appeals the decision of the Jefferson County Court of Common Pleas, Domestic Relations Division, granting the parties a divorce, wherein the trial court, inter alia, designated Plaintiff-Appellee, Racinda Grimm (hereinafter "Cindy") as the residential parent for the parties' minor children. The issues before us are whether: 1) in a custody dispute between parents, is a parent's suitability to be considered; and, 2) the trial court abused its discretion awarding custody to Cindy. Because we conclude the trial court did not err when it did not address the suitability of the parents, and its decision designating Cindy residential parent was supported by substantial competent, credible evidence, for the following reasons we affirm the trial court's decision.
On August 25, 1995, Donald and Cindy were married. Three children were born of that marriage: Hayden, dob 9/11/1996, Holden, dob 9/15/1997, and Dakota, dob 9/4/1998. Early in the marriage, the relationship was troubled. Cindy was seen with bruises on her neck and arms which she alleges resulted from Donald's physical abuse. She called the police three times on domestic violence charges. The first incident, in November 1996, Donald was not arrested. Second, in 1997, Donald was brought into court and, as part of a plea agreement, attended anger management classes. In December 1998, Cindy called the police to the marital home for the final time. Her face was bruised and bleeding and the police arrested Donald. The charges were dismissed for unknown reasons. After this arrest, Cindy and Donald separated.
In April 1999, Cindy invited Donald back into the house because their second child, Holden was becoming very sick. On May 10, 1999, the couple discovered Holden was suffering from brain cancer. This was later discovered to be a terminal condition. In July 1999, Cindy quit her job to stay home full time with the three children.
During the course of the next year, conditions in the household worsened. Between May 10, 1999, and May 10, 2000, Donald had 104 excused absences at work. Donald claims this was because Cindy either called him home or, when he got up in the morning, it was plain she was unable to care for the children that day. Cindy claims Donald merely used her and Holden as an excuse to miss work. The two began to fight constantly. Donald blamed Cindy for Holden's illness, used foul and abusive language toward her in front of the children, and threatened her. Cindy responded in kind. She began to get depressed and was prescribed medication for that depression, one of which was Xanax.
In April 2000, Cindy attempted suicide by taking an overdose of Xanax. She was taken to the hospital and remained there for approximately five days. When she was admitted to the hospital traces of marijuana were found in her blood. Both parties admit to smoking marijuana in the past and Donald had previously had his employment terminated for testing positive for marijuana in a drug test. Cindy's medications were changed and she was taken off of the Xanax. She also began to see Dr. Golas, a psychologist, to deal with her depression.
On Thursday, May 11, 2000, Donald came home from work a little after five in the evening. Donald and Cindy were having financial difficulties due to Holden's illness and Donald's absenteeism from work. As a result, Donald's parents were remodeling their basement to accommodate Cindy, Donald, and the children. The marital home was Cindy's separate property and she was not sure she wanted to leave the home to move in with Donald's parents. Cindy claims the two began to fight about the possible move when Donald threw her onto the bed and raped her. She then left the house. Donald claims he did not have sexual relations with her and that she left the house as soon as he got home from work. When Cindy left the house, she did not tell Donald where she was going. Cindy went to her friend's house and, sometime in the night, arrived at her mother's where she spent the remainder of the night. Cindy's mother testified that Cindy was very upset.
The next morning, Friday, May 12, 2000, Cindy's mother called Donald and told him where Cindy had been the night before. Cindy went back to the marital residence. Donald claims Cindy had a car accident on the way home. Cindy denies this. When Cindy arrived home, she passed out on the couch and slept most of the day.
On Saturday, May 13, 2000, the two were fighting again and Cindy left the house and went to visit another friend. While she was there, both Donald and Cindy's father arrived to try to talk with her. She eventually went to her parent's house. When she got there she looked terrible and her parents called Donald. They convinced her to go to Trinity West Hospital where it was discovered she had once again overdosed on Xanax. Even though the doctor had taken her off of Xanax, she had some left over from her last prescription.
While at the hospital, she was diagnosed with severe depression. The social worker put in charge of her case at the hospital testified Cindy appeared to be very depressed, stressed out, overextended, and sleep deprived. After consulting with Donald and Cindy's mother, the doctor decided that the best thing for Cindy would be some rest. Therefore, he placed her into Cambridge Hospital on Sunday, May 14, 2000, Mother's Day. Cindy claims Donald told the doctors and nurses lies which led to the hospitalization. Cindy's mother claims she heard Donald say, "Now she knows how I felt when I had handcuffs behind my back going to jail," as Cindy was handcuffed and placed in a police cruiser to be transferred to Cambridge. Donald claims he said, "Yes, now she knows how I felt that night she didn't come home."
In April, 2000, the couple had planned, through the Make-A-Wish Foundation, to take a trip to Disneyland with their three children. This trip was made possible due to Holden's terminal illness. The trip was to begin on May 21, 2000. When Cindy was in the hospital as a result of her overdose, Donald had her name taken off the ticket and replaced it with his father's name instead. No one informed Cindy of this name change and she assumed the trip would be postponed to a later date. Cindy testified that Donald told her "it was funny that [she] didn't get to go [on the trip]" and that he had her "where I want you, like a bum on the street." Donald also had many items moved from the marital residence into his parent's remodeled basement while Cindy was hospitalized. Therefore, when Cindy was released from the hospital on May 22, 2000, her children were gone and her house was practically empty. She filed a complaint for divorce on May 25, 2000.
On June 8, 2000, Donald answered that complaint and counterclaimed for divorce. The trial court heard the parties' motions for temporary orders on June 9, 2000. In its June 12, 2000 judgment entry, the trial court found it would be in the best interests of the children to remain with their paternal grandparents. The trial court then, on June 19, 2000, set up the visitation schedule and referred the matter to a magistrate. On June 22, 2000, upon a motion to alter that visitation schedule the magistrate heard the matter and altered that visitation schedule.
The matter proceeded to trial on October 2, 2000. Cindy testified she was no longer depressed. Cindy's psychologist, case worker, and mother all testified Cindy's disposition was much sunnier and more cheerful and considerably less depressed. Donald testified he had been assisting his mother in taking care of the children and wished for that arrangement to continue. He also testified that during the summer he totaled his parent's Jeep but did not get charged with drinking and driving because he only registered .089 on the breath test.
On November 27, 2000, the magistrate issued findings of fact and recommendations wherein he found, among other things, Cindy's interaction with the children was good, Donald's interaction with the children was questionable, that Cindy's stay at Cambridge was a result of Donald's manipulation, and that Donald had been guilty of domestic violence toward Cindy. The trial court then recommended that Cindy be named residential parent of the minor children. Donald filed his objections to those findings of fact and recommendations on December 8, 2000. On February 20, 2001, Cindy filed her responses to Donald's objections. In its March 14, 2001 Judgment Entry, the trial court sustained the magistrate's findings and recommendations and designated Cindy as the residential parent.
On appeal, Donald raises two assignments of error:
 "The trial court erroneously found that the best interests of the minor children would be served by designating Plaintiff-Appelleerather [sic] than Defendant-Appellant as the residential parent and legal custodian of said minor children."
 "The trial court erroneously failed to find that the Plaintiff-Appellee parent was unsuitable and therefore erred in awarding custody of the minor children to said Plaintiff-Appellee."
Because we conclude the trial court did not err when it did not address the suitability of the parents when resolving the custody dispute, and its finding that it was in the bests interests of the minor children for Cindy to be named residential parent was supported by substantial competent credible evidence, we affirm the trial court's decision.
As the trial court's decision adopted the findings of fact and recommendations of the magistrate, its decision will only be reversed on appeal if that decision was an abuse of discretion. Bullock v. Oles, 7th Dist. No. 99 CA 223, 2001-Ohio-3220, citing Wade v. Wade (1996),113 Ohio App.3d 414, 419, 680 N.E.2d 1305. This is because even though the magistrate is the person who hears the evidence, the trial court remains the ultimate finder of fact. Id. An abuse of discretion constitutes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482-483, 450 N.E.2d 1140.
In his second assignment of error, which we will address first for analytical purposes, Donald asserts the trial court erred when it did not find Cindy was an unsuitable parent. Donald is incorrect. Suitability is not an issue when determining custody disputes between parents. In any divorce action, the trial court must allocate the parental rights and responsibilities for the care of the minor children of the marriage. R.C. 3109.04(A). Pursuant to R.C. 3109.04, the court must make its determination based upon what is in the best interests of the children. In this action, the custody dispute only involves two parents. Thus, Cindy's suitability is a non-issue. Donald's second assignment of error is meritless.
In his first assignment of error, Donald argues the trial court erred when it designated Cindy as the residential parent for the couple's minor children. When an award of custody is supported by a substantial amount of credible and competent evidence, that award will not be reversed as being against the weight of the evidence. Bechtol v. Bechtol (1990),49 Ohio St.3d 21, 23, 550 N.E.2d 178. A trial court has broad discretion in matters concerning the allocation of parental rights and responsibilities and its decision will not be disturbed on appeal absent an abuse of that discretion. Masters v. Masters (1994), 69 Ohio St.3d 83,85, 630 N.E.2d 655. An abuse of discretion constitutes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. Blakemore, supra. "The discretion exercised by the trial court must be given our utmost respect as the trial court is in a superior position to evaluate the parties' credibility and the relevant factors." Lewis v. Lewis, 7th Dist. No. 99-JE-6, 2001-Ohio-3167, citing Miller v. Miller (1988), 37 Ohio St.3d 71,74, 523 N.E.2d 846.
"While a trial court's discretion in a custody modification proceeding is broad, it is not absolute, and must be guided by the language set forth in R.C. 3109.04." Miller at 74, 523 N.E.2d at 849.
 "(B)(1) When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding or in any proceeding for modification of a prior order of the court making the allocation, the court shall take into account that which would be in the best interest of the children.
"* * *
 "(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
 "(a) The wishes of the child's parents regarding the child's care;
 "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 "(d) The child's adjustment to the child's home, school, and community;
 "(e) The mental and physical health of all persons involved in the situation;
 "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 "(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 "(I) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state." R.C. 3109.04.
 "[T]he best interest of a child encompasses not only the home environment, but also the involvement of both parents." Davis v. Flickinger (1997), 77 Ohio St.3d 415, 419, 674 N.E.2d 1159.
In the present case, the magistrate's decision shows he carefully considered the factors in R.C. 3109.04(F)(1) when making its recommendation to the trial court. The magistrate's findings of fact addressed each of the various factors and explained the findings which cast a negative light on each party. Many of these findings, in this particular case, are identical as to both parties. For instance, the magistrate noted both parties desired to be named residential parent, both parties had a history of drug use without sufficient evidence of any present usage, the children had good relationships with both the maternal and paternal grandparents, and neither party had been determined to be the perpetrator of an act which led to the adjudication of a child as an abused or neglected child, had abused or neglected a child, or planned to establish a residence outside of Ohio. Furthermore, the magistrate recognized Holden's illness.
However, the magistrate made three findings which illustrate why it designated Cindy as residential parent. In it's first key finding, the magistrate found Donald had been guilty of domestic violence directed toward Cindy. It noted he had been arrested twice and one arrest resulted in a negotiated plea. These findings were based upon a substantial amount of competent and credible evidence as all parties agreed as to these basic facts. This certainly weighs against Donald being named residential parent.
In the second key finding, the magistrate found both parents to be in apparent good health. In doing so, the magistrate addressed Cindy's history of depression.
 "Plaintiff, Racinda Grimm, suffered from severe depression. In April of 2000 she overdosed on prescription medication, Xanax. Later, in May of 2000, she was committed to Cambridge Mental Health for a period of eight days. The evidence suggests that the second stay at mental health was a result of the manipulation of the Defendant, Donald Grimm.
* *
 "It was the opinion of the Plaintiff's psychologist, Anthony Golas, that the Plaintiff, Racinda Grimm, is able to provide for the care and sustenance of the children. It is the opinion of Laura Wellday, the assigned case manager for Mental Health, that the Plaintiff is able to provide for the care and sustenance of the children. The children's health and safety are not at risk while in the physical custody of the Plaintiff. Kim Slivka, the Valley Hospice nurse, testified that she did not have any concerns with the Plaintiff's care of Holden." November 27, 2000 Magistrate's Decision at 3-4.
These findings also appear to be supported by a substantial amount of competent, credible evidence. Lori Wellday testified that she thought Cindy was "much better" at the time of the hearing than she was in May 2000, that she was able to cope with the children, and that she was not a danger to herself or her children. Anthony Golas testified that although Cindy was very depressed when they first met, she was "doing pretty well," that she was "considerably less depressed," and her disposition was definitely more sunny and cheerful. He concluded he saw no reason Cindy could not care for her children. Kim Slifka testified Cindy had an appropriate relationship with Holden and she had no concerns for Holden when he was in Cindy's care.
There is also competent, credible evidence which could support the magistrate's finding that Cindy's second hospitalization was the result of Donald's manipulations. Cindy testified she and Donald fought all the time and he told her Holden's illness was her fault. Donald told the doctor "a bunch of lies" about Cindy which led to her hospitalization and the doctor apologized for relying on Donald's statements. Cindy's mother testified that as Cindy was being led to a police car in handcuffs to be taken to the hospital, Donald said, "Now she knows how I felt when I had handcuffs behind my back going to jail."
Cindy further testified that while she was in the hospital she was discharged to go home after five days, on a Friday, but Donald called the hospital and said she called him, threatening to kill him. Therefore, the hospital kept her inside for three more days, until Monday. She stated she could not have called him from the hospital because it would have been a long distance call. However, she said he called on Saturday and said, "He thought it was funny that I didn't get to go and that he got me kept there and asked me if I liked it. * * * And he said, `I got you where I want you like a bum on the street.'" Finally, on his own initiative Donald both began to move into his parent's remodeled basement and had Cindy taken off the Make-a-Wish trip while she was in the hospital and didn't inform her of either of these events. When Cindy was released her house was practically empty, she only had "the refrigerator and the stove and the couch" and her children were gone.
Even though Donald disputes many of these facts, namely, he argues the things he told the doctor were true and that he did not say the things to either Cindy or Cindy's mother that he was accused of saying, the findings were supported by the competent, credible evidence cited above.
The final finding which Donald disputes is the magistrate's finding that Cindy's interaction and interrelationship with the children was good while Donald's interaction and interrelationship with the children was questionable. The record reflects little testimony stating Cindy's interaction and interrelationship with the children is other than good. Donald's mother testified, "I just don't think [Cindy]'s ready to take care of the boys right now," but cannot give an explanation for that belief. Donald testified he had to be excused from 105 days from work because of Cindy's inability to care for the children. Finally, he said he took care of the children more than Cindy ever did. In contrast, virtually every other witness who had witnessed Cindy's interaction with the children thought it was good.
Cindy testified Donald would yell at and spank Holden when he got fussy from the pain resulting from his cancer and that he occasionally would over-medicate him. He also caused Holden to have a seizure one time by a spanking. Finally, Cindy testified she was the primary care-taker and that Donald would help if she asked, but not without a complaint. Donald and his parents all testify positively about his relationship with the children.
As the above illustrates, magistrate's findings that Cindy's relationship with the children was good and that Donald's relationship with the children was questionable were both supported by competent, credible evidence. In addition, because each of the magistrate's findings is supported by a substantial amount of competent, credible evidence, it was not an abuse of discretion for the trial court to adopt those factual findings.
In conclusion, the trial court has broad discretion when allocating parental rights and responsibilities. The evidence demonstrates both parties could provide appropriate housing and care to the children. However, given the facts before it, there was substantial competent, credible evidence to support the trial court's finding that it was in the best interests of the children for Cindy to be named residential parent. Moreover, it did not abuse its discretion when it designated Cindy as the residential parent for the couple's minor children. Donald's first assignment of error is meritless.
Because both of Donald's assignments of error are meritless, the judgment of the trial court is affirmed.
Vukovich, P.J., concurs in judgment only.
Donofrio, J., concurs.